Speer, J.
The plaintiffs having committed a breach of their contract, their right to recover depends on whether the sum mentioned is to be held a penalty or as liquidated damages. An English judge has said, after an examination of this very question: “ The only thing I am certain about is that there is a conflict of opinion.”^ This much, however,, is clearly settled : the question whether a sum mentioned is a penalty or liquidated damages is one of construction looking to the real nature and substance of the agreement. The words “ liquidated damages” are not conclusive; nor where it is expressly declared a penalty is the court-bound by the language. On the general question, however, we find not only dicta against dicta, but decisions opposed to decisions.
It will be observed that there are a number of covenants in the con *517 tract under consideration. Stipulation is had as to delivery of goods, and • the place is fixed. The quantity is specified from each cargo in Novem- and December, 1884, and a different quantity for March and April, 1885. The price to be paid is named, and the time of payment. The defendant is not to import or cause to be imported, or to ship to Charleston, except to plaintiffs, any such merchandise. The plaintiffs stipulate that they will not sell to any other person in Savannah except to Reedy. The defendant is to have the privilege of inspecting the fruit in Charleston. For the faithful performance of the agreement, embracing all these stipulations, the parties each bind themselves, one to the other, in the penal sum of $1,000. The Code of Georgia (paragraph 3, §2757) affords a lucid statement of a cardinal principle of construction of contracts : “ The construction which will uphold a contract in whole or in part is-to be preferred, and the whole contract should be looked to in arriving, at the construction of any part.” It follows that we cannot, from the consideration of questions arising from clauses of greater importance, eliminate the legal consequences flowing from the presence of stipulations of minor importance. Now, there is a numerous class of cases which show that where there are a number of things to be done, and one large sum is to be paid in respect of the non-performance of various-matters of different degrees of importance, then the court will construe the sum, if it can do so, as a penalty, and not as liquidated damages. Wallis vs. Smith, 21 Chan. Div. 250. In the leading case of Kemble vs. Farren, 6 Bing. 141, Chief Justice Tindal, in giving the opinion of the full court, while stating and holding the proposition insisted upon by the defendáñt’s counsel here, — viz., that if the claim be limited to breaches which were of an uncertain nature and amount, it would have had the effect to ascertain and liquidate the damages, — goes on to say : “ If, therefore, on the one hand, the plaintiff had neglected to make a single payment of £3 6s. 8d. a day, or on the other hand, the defendant had refused to conform to any usual regulation of the theatre, however minute or unimportant, it must have been contended that the clause in question in either case would have given the stipulated damages of £1,000. But that a very large sum should become immediately payable in consequence of the non-payment of a very small sum, and that the-former should not be considered as a penalty, appears to be a contradiction in terms; the case being precisely that in which courts of equity have always relieved, and against which courts of law have, in modern times, endeavored to relieve, by directing juries to assess the real damages sustained by the breach of the agreement.” It is safe in view of the apparent conflict, to say that when the damages for a breach of all the stipulatiods are uncertain in their nature, and cannot be ascer *518 tained, the sum fixed would be regarded as the settled and agreed damages; but when some of the breaches are ascertainable, and some are >not, in that case, as it is a penalty as to some, it is a penalty as to all. Atkins vs. Kinnier, 4 Exch. 776. This distinction will be found -to be fully sustained by the American authorities. Applied to the case at bar, it would determine in favor of the plaintiff’s right to recover. In Sutherland on Dam. 512, it is stated that when the damages are uncertain or difficult of proof, and the result is not manifestly .at variance with the principle of just compensation, the sum is held liquidated. But it would be manifestly at variance with the principle of just compensation when there are many stipulations, some trifling and some grave, some ascertainable in damages and some not, to hold that it was intended that a large sum Should be forfeited for any breach. In Swift vs. Crow, 17 Ga. 609, it ¡is held where there is a covenant to perform several things or pay the sum specified, and the claim may extend to the breach of any stipulation, in such case it seems to be well settled that the sum specified should be in the nature of a penalty. Pour text writers of recognized usefulness, If not authority, sustain this proposition. In Sutherland on Dam. 424, after reviewing an array of authority, the author concludes: “ This is believed now to be the doctrine generally held. If a gross sum is stipulated to be paid for any failure to fulfill an agreement consisting of several parts, and requiring several things to be done or omitted, it is a penalty.” Wood’s Mayne on Dam. 209, is identical in substance. 2 Sedgwick on Dam. 250, and note, discussing Kemble vs. Farren, the author states: “A distinguishing mark which the court seems to have had in mind in deciding the case was that there were stipulations of different degrees of importance, some trivial in character, all secured by one large sum. And the rule generally deduced from the case by subsequent •decisions, and applied in practice, is that a sum fixed as security for the performance of a contract containing a number of stipulations of widely different degrees of importance, breaches of some of which are to be .capable of accurate valuation, is to be regarded as a penalty.” See,- also> Field on Dam. 187-154. An exceedingly clear exposition’of this doctrine is found in the circuit court reports of Mr. Justice Woods (Taylor vs. •'Steamer Marcella, 1 Woods, 302), and is of great weight and force of authority. The court has examined with care all the decisions cited in ithe able argument of the counsel for the defendant. They do not affect the rule already stated. Without exception they construe contracts where there is but one stipulation, or where no damage is ascertainable, — in one an agreement to procure an assignment of a mortgage, in : another not to run a stage, another not to practice as surgeon or apoth *519 •ecary, again not to keep a victualling house, and several not to keep drinking-houses. The distinction between decisions of this class and the ease before the court is obvious.
Jury instructed to find for plaintiffs for $1,000. — The Reporter.
WHAT ARE DOMESTIC WINES?
As there seóms to be some doubt as to the construction to be given to the word “domestic,” as used in what is known as the “domestic wine” clause of the Local Option Act of Georgia, that is, whether the Legislature intended to describe a product-exclusively belonging to, and within the sovereign jurisdiction of the State, or in a national • sense, is answered in the' case of the Commonwealth vs. Giltinan, 64 Pa. St., 103. That portion of the opinion bearing on the point in question is as follows :
“Thompson, C. J,
The paramount question of this case is, whether the words “domestic distilled spirits,” in the inspection laws of this Commonwealth, mean only spirits distilled within the Commonwealth, or extend equally to spirits manufactured in other States and brought hither. The nature of State authority and jurisdiction would necessarily incline one to the opinion that the term “domestic” is only appropriately used in an act of the State Legislature to describe a product exclusively belonging to, and within the sovereign jurisdiction of the :State. As a government with sovereign powers within its limits and none outside, other States are, in a legislative sense, necessarily foreign. All productions within are domestic; those from outside are foreign. When the State speaks of “domestic” manufactures, it means, as a general thing, those within its jurisdiction: that, of course, is the first ¡sense of this expression, at least; if there be another, we must look fot it ah extra the expression. I think it very clear, that the term “domestic distilled spirits” means ex visceribus suis, those manufactured within this Commonwealth. But we have that within the Act of 1835, the ■commencement of the inspection system of liquors to-day, which is explanatory of those words. The first clause of the 123d section of the Act of the 15th of April, 1835, declares that “spirituous liquors distilled|within this Commonwealth shall, if designed for exportation from the port of Philadelphia, except,” &c., be liable to inspection by an inspector of “domestic distilled spirits,” appointed for the city and county of'Philadelphia; and the act provides for the appointment of inspectors also for .Lancaster, and certain towns and boroughs in the county, viz., for the borough of Wrightsville, in York county, Norristown, Montgomery -county, and for Alleghany county. And it further provides that “do *520 mestic distilled spirits” may be inspected at each of those places They may be inspected at these places as well as at Philadelphia. This is the meaning and reason for the phraseology in the act noticed by the counsel for the Commonwealth. There is no room to entertain the idea contended for, that the section means the inspection of spirituous-liquors distilled within this Commonwealth, as also the inspection of “domestic distilled spirits” in a national sense. In Catherwood vs. Collins, 12 Wright 480, the limited sense of the terms is accepted without a question. The learned judge below was quite right therefore, we think, in holding to this view. Upon the act of 1835, the Commonwealth had no case, for it was proved, and not controverted, that the spirits seized were manufactured in New York, and only rectified in Philadelphia.
But it was argued that, by the Act of 21st of April, 1858, the Act of 1835 was altered, and the liability to inspection enlarged, so as to'extend to “domestic distilled spirits” in a national sense. We are troubled with a refutation of this pretension, only because the section of the act relied on to prove this position was mainly kept out of view on the trial.
By the Act of 1835, only such liquors as were designed for exportation were subject to inspection, excepting coastwise. The Act of. 1858' changed this, and provided that uall domestic distilled spirits for sale at the port of Philadelphia, whether for exportation or otherwise, shall be inspected,” &c., by “the duly appointed inspectors of domestic distilled spirits, in the manner now provided by law.” This was a mere extension of inspection to all domestic distilled spirits of the kind meant by the original act, viz., all manufactured in the Commonwealth, and for sale at the port of Philadelphia, whether for export or otherwise. The Act of 10th of April, 1867, under which the seizure took place, did not extend the inspection laws beyond the subjects of them under previous acts. It regulated inspections, and provided the penalty of seizure of non-inspected liquors. The learned judge very properly held all these acts as in pari materia, and as applicable to one and the same subject-matter, namely, to the inspection of distilled spirits manufactured in this Commonwealth. There is not a word in either of the acts, subsequent to the Act of 1835, to extend the inspection laws beyond the subject-matter of that law; and, as we have already said, it contained a clause which was expository of its meaning, and proved it applicable only to the manufacture of spirits within the State.
This being the meaning of these acts, it would have been error to have admitted parol testimony as to their supposed meaning. That is never done. Whether an article of commerce is that which is described *521 given words in a statute, is sometimes the subject of proof. But this ■only defiaes the article, not fibe law. Whether an article was bohea tea, was the matter in controversy in the case of Two Hundred Chests ■of Tea: '9 Wheat, 430. It was seized by the collector at Boston, because entered as bohea, and he alleged it was black tea, which bore a higher duty. The question in proof there was, not what the Act of Congress was or meant, but what the article seized was. That was certainly the .■subject of proof and that was not what was proposed here. Here there was no dispute about the articles seized. The dispute was whether it was within the Acts of Assembly requiring its inspection. To ascertain that, the law must be construed by legal rules and by its constituted interpreters, the courts, and not by experts. The learned judge very properly, therefor, rejected the proposed testimony.” * * * *